IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE: CRAIG and GAYLA IBERG, Debtors              No. 4:07-BK-12286
                                                                    Ch. 7

TERESA PREWETT                                              PLAINTIFF

v.                          AP No. 4:07-ap-01233

CRAIG and GAYLA IBERG                             DEBTORS/DEFENDANTS

## MEMORANDUM OPINION

Before the court is the Complaint Objecting to Discharge and to Determine Dischargeability of a Debt [Complaint] filed by Teresa Prewett [Prewett], and the Answer filed by the debtors, Craig and Gayla Iberg. In her Complaint, Prewett seeks monetary damages for breach of contract, denial of discharge based on 11 U.S.C. § 727(a)(5), and a determination of dischargeability pursuant to 11 U.S.C. § 523(a)(6). This matter was tried on September 8, 2008. The parties appeared personally and by their attorneys. For the reasons stated below, the discharge and dischargeability counts are denied and dismissed as to both Craig and Gayla Iberg, and Prewett is awarded judgment in the amount of $67,075.06 against separate debtor Craig Iberg. Prewett may elect to file a proof of claim for that amount.[1]

### I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), (J), and (O). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy

---

[1] This is a "no asset" case. The damage award is in the event assets are found and a distribution is made.

1

Procedure 7052. A separate judgment will be entered pursuant to Federal Rule of Bankruptcy Procedure 7054.

## II. Findings of Fact

### A. Home Construction

Intending to build a home on property she owned, Prewett sought bids based on detailed architectural plans and specifications [the Plans]. Craig Iberg submitted the lowest bid by approximately $100,000. Pursuant to a Contractor Agreement [the Agreement], dated May 18, 2005, Prewett contracted solely with Craig Iberg, d/b/a Iberg Builders [the debtor], to construct a new home for $305,000. Article 1 of the Agreement incorporated the Plans as well as an addendum prepared by the debtor concerning specific items. The addendum was not a substitute for the Plans, as argued by the debtor; rather, the Agreement incorporated the Plans. Further, the Agreement called for the debtor to complete construction by December 31, 2005.

The debtor failed to construct the home in a timely or proper manner. The debtor's principal defense to a litany of horrific construction problems was an assertion that Prewett's acceptance of his low bid was an acknowledgment and acquiescence to both non-compliance with the Plans and substandard (i.e. "cutting corners") construction. Prewett's acceptance of the debtor's bid had neither consequence. The acceptance of a low bid did not relieve the debtor from his contractual obligation to build the home according to the Plans and "in a workman-like manner and in compliance with all building codes and other applicable laws." (Pl.'s Ex. B at 2, Art. 5, ¶ 1.) The debtor also argued that although he might be a bad contractor, his deficiencies did not equate to willful and malicious conduct sufficient to find the underlying debt nondischargeable.

2

The debtor used substandard materials as well as unacceptable and inadequate construction practices, which resulted in a flawed and unsafe dwelling. Prewett's home inspection expert, Tom Allen, put it best when he stated the following in his December 9, 2006, report:

> The invasive inspections revealed the most blatant disregard for your physical safety and financial waste I have witnessed in my over 30 years in this profession. The report by Mr Lewis is shocking but not surprising. In most structures I encounter deficiencies in a specific area where there is failure to perform on the part of a contractor or a sub contractor. This isolates the area of concern and makes correction manageable. This is not the case with your property.
>
> There were no areas above the foundation that conformed to "best practice", the building code, the energy code; in fact there was more effort than necessary expended in doing the work wrong than had it been done properly. With that in mind it appears that hast[e], inexperience, lack of oversight, lack of basic engineering, deliberate substitution of inappropriate materials, lack of product knowledge, and disregard of existing Protective Code requirements has produced a structure that is in failure.

(Pl.'s Ex. JJ.)

He concluded, "[t]his is an unfortunate situation with no good solution." *Id.*

Phillip Lewis, a structural engineer hired by Prewett, harshly concluded the following in his November 24, 2006, report:

> 1. It appears that the contractor had blatant disregard for what was designed and specified on the plans with regards to structural framing. Additionally, it appears that his efforts were even fraudulent in that he was able to cover all of the framing with sheetrock without any attempt to correct the issues.

3

>2. His efforts (or lack thereof) have severely compromised the structural integrity of the residence. Undersized framing members coupled with improperly supported roof rafters and major beams have led to this condition.
>
>. . . .
>
>5. The owners of the residence did not receive the structure that was specified in great detail (above average for most residential house plans) on the design drawings that they paid for and the contractor specifically bid from.

(Pl.'s Ex. KK.)

Among other remedial measures, the structural engineer recommended removing and replacing the entire roofing infrastructure. *Id.* The framing was inadequate and undersized in full load conditions, such as wind and snow. He noted a systematic use of substandard materials, both in quality and size, which caused potentially catastrophic safety concerns. (Pl.'s Ex. KK.) Mr. Lewis was also troubled by the debtor sheetrocking over obviously improper framing, thus hiding the deficient work. *Id.* The structural engineer concluded that the home was built in a manner that would clearly cause Prewett financial harm. *Id.*

The debtor acknowledged his poor workmanship and inadequate construction. He completely lacked the requisite skill sets to hold himself out as a contractor. He was not even appropriately licensed; rather, his wife, separate debtor Gayla Iberg, held a contractor's license. According to the debtor, he is incapable of passing the licensing test. The Agreement, however, does not refer to Gayla Iberg; the "Contractor" listed is "Craig Iberg DBA IBERG Builders." The Contractor's State License Number that appears at the end of the Agreement under the debtor's signature is therefore not his license number, even though the debtor is the only individual signator to the Agreement. (Pl.'s Ex. B.)

4

Conversely, Prewett did little or no investigation into the debtor's qualifications. She was enamored with his low bid and considered his "good ole boy" status as sufficient assurance of his ability to perform. She expressed her approval of his bid immediately on meeting Iberg, obviously impressed by the low amount, which in reality invited more, not less, scrutiny.

The experts' testimony painted a dismal picture of a construction disaster. The debtor demonstrated no competence from beginning to end. The construction methods employed resulted in an inferior and potentially dangerous product. Although the debtor used a framing subcontractor, he not only failed to adequately supervise the framing, but he was also either negligent or incompetent in assessing the subcontractor's performance. The Agreement states that although the contractor may employ subcontractors, the debtor remains "responsible for the proper completion of this [Agreement]." (Pl.'s Ex. B at 2, Art. 5, ¶ 4.)

In addition to the express terms of the Agreement, the addendum provides that the home would be built in accordance with the Southern Code of Arkansas. According to Prewett's home inspection expert, the Southern Code of Arkansas comprises a number of codes that reflect minimum construction standards. The debtor failed to meet even these minimum standards and wholly failed to build a home in a manner consistent with the comprehensive Plans provided by Prewett.

Two other pertinent incidents occurred during construction. First, the debtor failed to adequately monitor a scrap heap fire, which resulted in a wildfire that destroyed over three acres of the five-and-a-half acre jobsite. Insurance compensated Prewett for this loss. Second, while the jobsite was under his supervision and accessible to his employees and subcontractors, someone defecated in the attic, leaving the remains to be discovered by Prewett's structural

engineer. Both incidents are consistent with a pattern of incompetence and a lack of supervision.[2]

## B.  Ford Truck

At trial, Prewett sought to prove that the debtors should be denied a discharge for their failure to list or to admit ownership of, at their first meeting of creditors, a 1999 white Ford truck [the Truck]. Prewett failed to prove that the debtors owned the Truck at the time they filed their petition.

## C.  Damages

As a result of the debtor's breach of contract, Prewett is entitled to the following damages:

1. $62,000 paid to another contractor for remedial work to the home.
2. HVAC expenses of $197.95, $70.12, $145.13, $112.88, $145.13, $261.96, $204.20, and $209.57.
3. $6000 for undelivered sod and dirt work.
4. $2200 for concrete work.
5. Home inspection costs of $275 and $320.
6. Payment of $1000 to Phillip Lewis, the structural engineer.
7. Payments of $1235 and $28 to Michael Hahn, Prewett's architect, for post-construction services.
8. $150 for installing a school mascot insignia.

---

[2] The debtor denied personally defecating in the attic, and no clear evidence established otherwise.

6

  9. $70.12 to repair a defective chimney cap.

  10. $450 for a second appraisal required by Prewett's bank.

  11. Attorneys fees that the court, in its discretion, awards in the amount of $7000.

From these damages, $15,000 is deducted, representing the amount outstanding under the Agreement.

  TOTAL: $67,075.06

Prewett's additional damage claims will be discussed below.

### III.  Discussion

### A.  Dischargeability

  Prewett accurately contends that she incurred damages in a compensable amount; therefore, the inquiry is whether that amount is nondischargeable under the bankruptcy code. Prewett did not introduce any evidence that would support a finding of nondischargeability respecting Gayla Iberg; the entirety of Prewett's dealings involved the separate debtor, Craig Iberg.  The debtor, while acknowledging his incompetent work, asserted that the nature of the underlying debt and his conduct dictate a resolution in his favor. The debtor is correct.

  Section 523(a) of the code specifically exempts certain debts from discharge in bankruptcy.  "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).  "To establish that a debt is nondischargeable consistent with this exception, the party seeking to prevent discharge must show by a preponderance of the evidence that the debt is for both 'willful . . . injury' and 'malicious injury.'" *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180 (8th Cir.

2008) (citing *Fischer v. Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999), *cert. denied*, 528 U.S. 931, 120 S. Ct. 330, 145 L. Ed. 2d 258 (1999); 11 U.S.C. § 523(a)(6)).

This matter requires consideration of § 523(a)(6) in the context of a breach of contract claim and, at least arguably, a fraud claim. Determining whether the debt to Prewett is dischargeable requires a two-step examination: first, "what 'injury' the debt is 'for'" and second, "whether the debtor both 'willful[ly]'and 'malicious[ly]'caused that 'injury.'" *Lockerby v. Sierra*, 535 F.3d 1038, 1040–41 (9th Cir. 2008); *Patch,* 526 F.3d at 1181.

### 1. Breach of Contract

The Agreement required timely completion in a workmanlike manner, according to the Plans and in compliance with applicable building codes; the injury to Prewett is a flawed and unsafe dwelling built in an unsatisfactory manner contrary to the parties' Agreement. To be nondischargeable, this specific injury must result from "willful and malicious" conduct by the debtor.

Prewett asserts that her breach of contract damages should be excepted from discharge pursuant to § 523(a)(6). Although the debtor breached the Agreement, it is a well-settled principle of law that "a simple breach of contract is not the type of injury addressed by § 523(a)(6)." *Snoke v. Riso* (*In re Riso*), 978 F.2d 1151, 1154 (9th Cir. 1992) (citing *Barbachano v. Allen*, 192 F.2d 836, 838 (9th Cir. 1951); *Commc'n Workers of Am. v. Akridge* (*In re Akridge*), 71 B.R. 151, 154 (Bankr. S.D. Cal. 1987) ("debts excepted from discharge under § 523(a)(6) relate solely to tortious liabilities, not debts stemming from breach of contract").

"An intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful *tortious* conduct." *Id.* (emphasis added) (citing

8

*Clarks Delivery, Inc. v. Moultrie* (*In re Moultrie*), 51 B.R. 368, 373 (Bankr. W.D. Wash. 1985); *Cadillac Vending Co. & Union Music Co. v. Haynes* (*In re Haynes*), 19 B.R. 849, 851 (Bankr. E.D. Mich. 1982)). Most courts adhere to this principle. *See Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (holding that "523(a)(6)'s exemption from discharge . . . is confined to debts 'based on what the law has for generations called an intentional tort.'"); *Lockerby*, 535 F.3d at 1040–41; *Petralia v. Jerich* (*In re Jercich*), 238 F.3d 1202, 1205–06 (9th Cir. 2001); *Barclays Am./Bus. Credit v. Long* (*In re Long*), 774 F.2d 875, 882 (8th Cir. 1985); *Neiman v. Irmen* (*In re Irmen*), 379 B.R. 299, 312–13 (Bankr. N.D. Ill. 2007); *Grobel v. Johnson* (*In re Johnson*), 2007 WL 5065546 at *3 (Bankr. D. Minn. Nov. 14, 2007); *Wish Acquisition, L.L.C. v. Salvino* (*In re Salvino*), 373 B.R. 578, 588 (Bankr. N.D. Ill. 2007); *Standard Prof'l Serv., L.L.C. v. Boles* (*In re Boles*), 2007 WL 201137 at *3 (Bankr. M.D.N.C. Jan. 19, 2007); *Donaldson v. Hayes* (*In re Hayes*), 315 B.R. 579, 590 (Bankr. C.D. Cal. 2004); *Balt. County Sav. Bank v. Malinowski, Jr.* (*In re Malinowski*), 249 B.R. 672, 675–76 (Bankr. D. Md. 2000).[3]

Intentional torts require the actor to "intend the consequences of the act" rather than an intentional act with unintended consequences. *Geiger*, 523 U.S. at 62. Therefore, in breach of contract cases, "something more" is necessary to exempt a debt from discharge–tortious conduct. *Lockerby*, 535 F.3d at 1038.

The court must analyze the debtor's conduct under state law to determine whether it is sufficiently tortious under § 523(a)(6). *Id.* In Arkansas, a breach of contract claim without an allegation of a separate tort does not render the breach tortious. *Quinn Companies, Inc. v.*

---

[3] In contrast to the cases cited, the court in *Carter v. Trammel* (*In re Trammel*) found the plaintiff's state court judgment against the debtor nondischargeable because the debtor evidenced a conscious intent to breach a personal services contract and violated a state court judgment causing a "willful and malicious injury." 172 B.R. 41, 44–46 (Bankr. W.D. Ark. 1994).

*Herring-Marathon Group, Inc.,* 299 Ark. 431, 431–33, 773 S.W.2d 94, 94–95 (Ark. 1989) (finding that "a plaintiff may not transform a breach of contract action into a tort claim by alleging [that] the breach was motivated by malice. The breach itself simply is not a tort.")

Prewett proved that the debtor breached a construction contract by constructing her home in a manner that resulted in a flawed and unsafe dwelling. In the context of a simple breach of contract action, Prewett did not prove that the debtor's actions were sufficiently tortious as required by 11 U.S.C. § 523(a)(6).

### 2. Fraud

Prewett cumulatively asserts fraudulent conduct in conjunction with her breach of contract claim. In her Complaint, Prewett suggests that the debtors "fraudulently hid the structural defects by covering them with sheet rock without any attempt to correct structural problems." (Compl. at 4, ¶28.) Prewett also alleges that the debtors "maliciously left human feces and used toilet paper" in the attic and "willfully and maliciously constructed the Residence to harm and defraud Ms. Prewett." (Compl. at 4–5, ¶¶ 33–34.) The Complaint concludes as follows:

> 35. Based on the aforementioned conduct, the purposeful use of inferior materials, intentional failure to pay subcontractors, and willful disregard for Ms. Prewett's safety when constructing her residence, the Defendants have maliciously and intentionally harmed Ms. Prewett.

(Compl. at 5, ¶35.)

Prewett argues that the debtor fraudulently disguised his poor workmanship, which coupled with the poor nature of his performance, justifies a nondischargeability ruling. In her Complaint, Prewett essentially conflates the concept of "fraud" with the concept of "willful and malicious injury."

Accordingly, the court must determine whether the debtor's conduct constitutes a "willful" and "malicious" injury to Prewett. *Lockerby*, 535 F.3d at 1040–41; *Patch,* 526 F.3d at 1181. In *Geiger*, the United States Supreme Court resolved a circuit split as to which injuries fell within the "willful" exception provided in § 523(a)(6). 523 U.S. at 61. The Court held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)," rather "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* at 61, 64 (emphasis original) (finding that a debt arising from a medical malpractice judgment was attributable to the physician's negligent or reckless conduct rather than a willful, intentional tort).

Since the *Geiger* decision, the scope of "willful" has expanded to include those circumstances in which "the debtor either desires to bring about the consequences of his conduct or [when] the debtor knows that the consequences are certain, or substantially certain, to result from his conduct." *Patch*, 526 F.3d at 1180. "Thus, even gross negligence or reckless disregard of the rights of others is not sufficient as a basis upon which to fasten the label of nondischargeability. Even if the conduct is wholly unreasonable under the circumstances, if subjective bad faith is not shown, it is not proper to decree nondischargeability." *Hale v. Frazee* (*In the Matter of Frazee*), 60 B.R. 109, 112 (Bankr. W.D. Mo. 1986).

The second prong of the injury requirement set forth in § 523(a)(6) requires a debtor to act maliciously. The Eighth Circuit has held that "malicious" injury involves conduct that is "more culpable than that which is in reckless disregard of [the] creditors' economic interests and expectations, as distinguished from mere legal rights." *Vaughn v. Quinn* (*In re Quinn*) 170 B.R. 1013, 1018 (Bankr. E.D. Mo. 1994) (citing *Barclays Am./Bus. Credit, Inc. v. Long* (*In re Long*),

11

774 F.2d 875, 881 (8th Cir. 1985)). Malice requires conduct that exceeds recklessness and "target[s] the creditor . . . at least in the sense that the conduct is certain or almost certain to cause . . . harm." *Sells v. Porter* (*In re Porter*), 539 F.3d 889, 894 (8th Cir. 2008) (citing *Siemer v. Nangle* (*In re Nangle*), 274 F.3d 481, 484 (8th Cir. 2001)).

Several courts in the Eighth Circuit have considered what actions by a debtor constitute "willful" and "malicious" under § 523(a)(6). *Porter*, 539 F.3d at 889 (holding that a debtor's actions were adverse and retaliatory constituting willful and malicious injury by forcing the plaintiff to choose between giving up a harassment claim or continuing to work in a harassing environment); *Patch,* 526 F.3d at 1182–83 (holding that a wrongful death judgment was dischargeable even though the mother/debtor left her son with her live-in boyfriend, who had severely abused the child in the past, and refrained from obtaining medical assistance for her son, who later died after her boyfriend abused him, did not constitute "willful" action within the meaning of § 523(a)(6), concluding that the mother did not intend the consequence of her child dying by her acts); *Frazee*, 60 B.R. at 113 (concluding that although the debtor's excessive speed caused an automobile accident involving the plaintiff, the debtor's grossly negligent actions did not rise to the level of willful and malicious necessary to find the plaintiff's judgment nondischargeable).

A dischargeability determination under § 523(a)(6) has been considered in the context of home construction contracts. *Quinn*, 180 B.R. at 552-54 (citing *Vaughn v. Quinn* (*In re Quinn*), 170 B.R. 1013 (Bankr. E.D. Mo. 1994) (finding that although the debtor breached a construction contract by rendering poor workmanship on the roof of the house as well as other areas–using low quality paint, installing a crawl space access door backwards, venting a sink vent

12

improperly, and completing certain plumbing work improperly resulting in the flooding of the basement–the debtor's actions did not rise to the level of malice required to find the creditor's judgment nondischargeable); *Stevens v. Antonious* (*In re Antonious*), 358 B.R. 172, 187 (Bankr. E.D. Pa. 2006) (citations omitted) (finding that the negligent performance of a home repair contract fell outside the scope of § 523(a)(6))*; Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1024 (Bankr. N.D. Ill. 1996) (concluding that plaintiffs' failure to present sufficient evidence that the debtor intended to build the house with defects warranted a finding of dischargeability even though the debtor was "obviously negligent in building the [p]roperty and breached the contract and building code in many ways.").

In this instance, the record does not reflect that the economic injury to Prewett was the result of willful or malicious conduct by the debtor. The concept of "willful" requires something greater than recklessness or negligence; it requires an intention or desire to injure the aggrieved party. The debtor is simply an incompetent contractor. Prewett hired him without adequate inquiry or scrutiny; she was acting on her instinctual reaction to the debtor coupled with his favorable bid, an amount considerably below the other competing bids. The record does not sufficiently reflect that the debtor acted in bad faith or had an active intent to build a house that would economically or physically harm Prewett. Rather, he was an incompetent contractor who underbid the project and thought Prewett understood that his suspect low bid meant that he would have to cut costs in some manner.

Iberg held himself out as a contractor, but he was neither licensed nor competent. Prewett, however, is not pursuing Iberg based upon common law misrepresentation or fraud; rather, Prewett imbues a breach of contract action with allegations of fraud sufficient to find that

13

"willful and malicious" conduct occasioned the resulting injury. The record simply does not support this conclusion. Prewett eschewed caution and prudence when presented with the debtor's low bid–a bid that invited more, not less, scrutiny. Iberg did not intentionally build a flawed house in a bad faith effort to injure Prewett. The testimony at trial, as well as the demeanor of the witnesses, reflects that this is a circumstance where the results were consistent with mediocrity exacerbated by an obviously unrealistic construction price.

The record does not support a finding that the debtor desired or had a motive to build a bad house or even knew the consequences of his acts were certain, or substantially certain, to result in injury to Prewett. Although Prewett is not held to any standard of expertise, the debtor did allow Prewett to inspect the framing. The record reflects that throughout the construction process the debtor was acting out of incompetence rather than bad faith or overt intent to target and harm Prewett. Insufficient evidence exists to suggest that the debtor's conduct exceeded recklessness in engaging in conduct certain to cause her harm.

This case is distinguishable from *Hamilton v. Hamilton* (*In re Hamilton*), 390 B.R. 618 (Bankr. E.D. Ark. 2008), a very recent decision applying § 523(a)(6). In *Hamilton*, the ex-husband clearly targeted his ex-wife by deliberately and purposely causing the death of her horses, which he was under an obligation to care for during the course of their divorce proceedings. Here, the debtor was not operating in a deliberate manner intending to bring about an injury to Prewett. He had no motive to do so, and insufficient evidence reflected an intent to do so.

### B. Discharge

Prewett sought to deny the debtors' discharge for their failure to adequately list or to admit, at their first meeting of creditors, their ownership of the Truck. Prewett asserts 11 U.S.C. § 727(a)(5), which provides that discharge is not appropriate if the debtors have "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; . . . ." While it may have been more appropriate to use 11 U.S.C. § 727(a)(4), Prewett still failed to prove that the debtors owned the Truck on the date they filed their petition. Accordingly, discharge is appropriate under these facts.

### C. Damages

Under Arkansas law, the preferred measure of damages in breach of contract cases involving the construction of a new house is the cost of repairing the defects in the home. *Pennington v. Rhodes*, 55 Ark. App. 42, 50, 929 S.W.2d 169, 173 (Ark. Ct. App. 1996). The purpose of using a cost-of-repair measure of damages is to allow the homeowner to recover the amount necessary to repair the defective home to the quality it should have been had the builder performed according to the contract. *Id.* at 50, 929 S.W.2d at 173 (citing *Daniel v. Quick*, 270 Ark. 528, 696 S.W.2d 81 (1980)). The *Pennington* court recognized that the cost-of-repair measure may lead to economic waste in certain situations, in which case the difference in market value of the house as contracted and the house as built would be the correct measure of damages. *Id.* at 52, 929 S.W.2d at 174. In this case, Prewett sought damages equal to the amount that she

paid to repair the defects in her home. Thus, $67,075.06 in cost-of-repair damages are appropriate here.

Prewett also sought additional damages that are not awarded herein. Specifically, Prewett reached an agreement with the debtor and National Home Center with respect to an outstanding invoice. Each party was to bear responsibility for one-third of the invoice amount. The debtor did not pay his one-third. Although Prewett asked that this amount be paid, National Home Center is not a party to this action, and the evidence did not establish that Prewett might be liable for the debtor's one-third.

Prewett also sought damages in the amount of $17,000 for apartment rental; $10,894.53 representing the interest Prewett had to pay on her construction loan after the scheduled completion date (determined by comparing her construction loan rate with her lower long-term rate); rental storage at $149.42 a month; and $82,998 representing the difference over the lifetime of her loan between the interest rate she could have had at the time of timely completion versus the actual and higher interest rate at the time of actual completion. These damages are not awarded.

Consequential damages are "damages that do not flow directly and immediately from the breach" of a contract, "but only from some of the consequences or results of the breach." *Reynolds Health Care Serv., Inc. v. HMNH, Inc.*, 364 Ark. 168, 175, 217 S.W.3d 797, 803 (Ark. 2005). Further, a defendant's mere knowledge that a breach of contract will cause special damages is not sufficient to award the plaintiff consequential damages; rather, the plaintiff must prove "that the defendant at least tacitly agreed to assume responsibility" for damages beyond

16

those resulting directly and immediately from the breach. *Id.*, 217 S.W.3d at 804; *see also Deck House, Inc. v. Link*, 98 Ark. App. 17, 26, 249 S.W.3d 817, 825 (Ark. Ct. App. 2007) (holding that although the homeowners knew that the home designer company was in the business of selling materials in a package with its drawings, the company did not prove that the homeowners had tacitly agreed to pay for the entire package if they used the designer's drawings without authorization and thus were not liable for consequential damages). Of course, parties may expressly provide for consequential damages in the contract, but in the absence of such a provision, there must be evidence that the breaching party "at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part." *Reynolds Health* at 176, 217 S.W.3d at 804. Thus, absent an express contractual provision, if the plaintiff cannot prove that the defendant at least tacitly agreed to be liable for damages beyond those directly created by the breach of contract, consequential damages should not be awarded.

Here, no provision in the Agreement provided for consequential damages, and Prewett introduced no evidence that the debtor tacitly agreed to assume special damages if he breached the Agreement. As a result, the debtor is not responsible for any consequential damages.

### IV. Conclusion

For the reasons stated herein, the debtors are granted a discharge. A separate judgment will be entered against separate debtor, Craig Iberg, as provided herein. Prewett may file a proof of claim in this proceeding with her distribution, if any, to come solely from the estate.

IT IS SO ORDERED.

October 16, 2008
DATE

RICHARD D. TAYLOR
U.S. Bankruptcy Judge

cc:    Mrs. Jessica A. Middleton-Kurylo
        Mr. Michael J. Knollmeyer
        Mr. James F. Dowden